# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 39071 (reh)**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Xavier L. RICE**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 29 January 2021

———————————

*Military Judge:* W. Shane Cohen (motions); Jennifer J. Raab.

*Approved sentence:* Reduction to E-2 and a reprimand. Sentence adjudged 7 March 2019 by GCM convened at Hurlburt Field, Florida.

*For Appellant:* Major David A. Schiavone, USAF; William E. Cassara, Esquire.

*For Appellee:* Lieutenant Colonel Brian C. Mason, USAF; Major Anne M. Delmare, USAF; Mary Ellen Payne, Esquire; Alexis Dorner (civilian extern).[1]

Before LEWIS, D. JOHNSON, and CADOTTE, *Appellate Military Judges.*

Senior Judge LEWIS delivered the opinion of the court, in which Judge D. JOHNSON and Judge CADOTTE joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

[1] Ms. Dorner was at all times supervised by attorneys admitted to practice before this court.

LEWIS, Senior Judge:

Appellant's case is before this court for the third time. At Appellant's original trial in January 2016, a general court-martial composed of officer members convicted Appellant, contrary to his pleas, of three specifications of abusive sexual contact and one specification of assault consummated by a battery in violation of Articles 120 and 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920, 928.[2,3] The original court-martial sentenced Appellant to a bad-conduct discharge, 30 days of hard labor without confinement, and reduction to the grade of E-1. The convening authority approved the original adjudged sentence. Upon initial review, this court affirmed the findings and sentence. *United States v. Rice*, No. ACM 39071, 2017 CCA LEXIS 745, at *37 (A.F. Ct. Crim. App. 20 Oct. 2017) (unpub. op.).

Subsequently, the United States Court of Appeals for the Armed Forces (CAAF) granted Appellant's petition for review to determine whether our court erred in deciding that a propensity instruction given by the military judge, contrary to *United States v. Hills*,[4] was harmless beyond a reasonable doubt. *United States v. Rice*, 77 M.J. 365 (C.A.A.F. 2018) (mem.). The CAAF reversed the decision of this court and set aside the three abusive sexual contact convictions which were Specifications 3, 4, and 5 of the Charge and the sentence. *See id.* at 365–66. The CAAF also affirmed the "remaining findings" which included a finding of guilt to Specification 2 of the Charge, the assault consummated by a battery conviction under Article 128, UCMJ. *See id.* The CAAF remanded the record to our court with authority "to order a rehearing on Specifications 3, 4, and 5 of the Charge and the sentence." *Id.* at 366. We ordered the record returned to The Judge Advocate General of the Air Force for remand to the convening authority for further action consistent with the CAAF's decision. *United States v. Rice*, No. ACM 39071, 2018 CCA LEXIS 339 (A.F. Ct. Crim. App. 11 Jul. 2018) (order). We authorized a rehearing on Specifications 3, 4, and 5 of the Charge and the sentence. *Id.*

---

[2] References to the punitive articles of the Uniform Code of Military Justice (UCMJ) are to the *Manual for Courts-Martial, United States* (2012 ed.) (2012 *MCM*). Unless otherwise specified, all other references to the UCMJ and all references to the Rules for Courts-Martial and the Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*).

[3] Appellant was acquitted of one specification of sexual assault, an alleged violation of Article 120, UCMJ. Appellant was also acquitted of one specification of abusive sexual contact, but convicted of the "lesser included offense" of assault consummated by a battery, a matter which we address as part of Appellant's first assignment of error.

[4] 75 M.J. 350 (C.A.A.F. 2016).

At the rehearing held in March 2019, a panel of officer and enlisted members convicted Appellant, contrary to his pleas, of Specification 4 of the Charge, abusive sexual contact of GP, a female enlisted Air Force member. Appellant was acquitted of Specifications 3 and 5 of the Charge—the other two specifications of abusive sexual contact for which a rehearing was authorized. Appellant was sentenced for two offenses—the previously affirmed assault consummated by a battery committed against RJ, a female enlisted Air Force member at the time of the offense—and the abusive sexual contact committed against GP. At the rehearing, the court-martial sentenced Appellant to reduction to the grade of E-2 and a reprimand. The convening authority approved the adjudged rehearing sentence.

After the rehearing and in this appeal, Appellant raises four assignments of error: (1) whether the assault consummated by a battery specification should be set aside because it is not a lesser included offense of abusive sexual contact under *United States v. Armstrong*, 77 M.J. 465 (C.A.A.F. 2018); (2) whether the evidence supporting his two convictions is legally and factually sufficient; (3) whether trial defense counsel provided ineffective assistance of counsel; and (4) whether an unreasonable post-trial delay in the convening authority's action violates due process.[5]

On the first assignment of error, the parties agree that assault consummated by a battery is not a lesser included offense of abusive sexual contact since the CAAF's decision in *Armstrong*. *See* 77 M.J. at 465, 467. We agree that the parties are correctly interpreting the law as of 28 June 2018 when the CAAF issued *Armstrong*. *See id.* at 465. Still, we determine that we lack the authority to further address this assignment of error as the remedy Appellant seeks—setting aside a finding of guilty—would require our court to dismiss a specification the CAAF previously affirmed on 18 April 2018, less than three months before *Armstrong* was released. To decide the legal issues raised by this assignment of error and an appropriate remedy, if any, we must be convinced that the CAAF's remand to us granted us the authority to disturb their previously affirmed findings. After careful scrutiny of the remand language, we see nothing in it that could be construed as granting us authority to further analyze the legal issues raised by the assignment of error, including whether Appellant waived or forfeited the issue at his first trial. *See Rice*, 77 M.J. at 366. If we do not have the authority to analyze the legal issues involved, then we certainly do not have the authority to grant Appellant the remedy he seeks.

In a similar manner, we conclude we lack authority to address part of Appellant's second assignment of error—the challenge to the legal and factual sufficiency of Specification 2 of the Charge, the affirmed assault consummated

---

[5] We have reworded the assignments of error.

by a battery conviction. This too is beyond the scope of the CAAF's remand. In our view, we would also need specific authority from our superior court before we could address either legal or factual sufficiency and we see no such authority in the remand language. To be clear, Appellant already received an Article 66, UCMJ, 10 U.S.C. § 866, review of the affirmed specification. *Rice*, unpub. op. at *37. Appellant raised an assignment of error on the legal and factual sufficiency of this specification and our court found the specification both legally and factually sufficient and affirmed the findings of guilty. *Id.* at *2, 18–20, 37. In our view, Appellant must seek relief from the CAAF, as our superior court has also affirmed the findings of guilty to this specification.

In deciding these two matters, we relied primarily on the law of the scope of remands detailed by the CAAF's predecessor, the United States Court of Military Appeals (CMA), in *United States v. Montesinos*, 28 M.J. 38 (C.M.A. 1989).[6] In *Montesinos*, the CMA stated, "If this Court remands a case to the Court of Military Review, that court can only take action that conforms to the limitations and conditions prescribed by the remand." *Id.* at 44 (citation omitted). The CMA also explained "the terms of the mandate may establish a particular matter as the 'law of the case' [and] . . . the appropriate place to seek relief from an oppressive order is with the tribunal which issued it." *Id.* (citations omitted). In this case, the CAAF's remand did not purport to confer upon this court another opportunity to conduct anew an Article 66, UCMJ, review of the affirmed assault consummated by a battery specification or even a limited review of a specific legal issue associated with it. We have determined the two challenges Appellant raises to the affirmed findings of Specification 2 of the Charge are beyond the scope of the remand we were given.

Regarding the remaining assignments of error, which involve the rehearing specifications or matters from the rehearing, we find no material prejudice to a substantial right of Appellant. We affirm the finding of guilty of abusive sexual contact of GP in Specification 4 of the Charge and the rehearing's sentence.

## I. BACKGROUND

Appellant was convicted at the rehearing of abusive sexual contact of GP by touching her buttocks with his hand with the intent to gratify his sexual desire. This incident occurred shortly after a squadron holiday party ended at

---

[6] We also considered two cases which cited *Montesinos* and involved remands by the CAAF to a Court of Criminal Appeals. *See United States v. Riley*, 55 M.J. 185 (C.A.A.F. 2001); *United States v. Kelly*, 78 M.J. 638 (A. Ct. Crim. App. 2018) (en banc), *rev. denied*, 2019 CAAF LEXIS 552 (C.A.A.F. 26 Jul. 2019). While each of these cases resulted in several appellate opinions, we found the cited decisions to be most relevant for our consideration.

2200 hours on 5 December 2014. The party was held a local hotel near Fort Walton Beach, Florida. After the formal party ended, Appellant, GP, and several members of their squadron moved from the banquet area where the party was held to the hotel's bar near the lobby. GP, who was part of the group responsible for planning and executing the party, spoke to the squadron's commander as the party ended. She then went to the hotel's bar to get a ginger ale. Appellant approached GP from behind and without saying anything "firmly grabbed" her buttocks. GP turned around quickly and told Appellant that what he did was "inappropriate," "unprofessional and uncalled for." Appellant laughed and asked GP if she liked it. About 15 minutes later, Appellant approached GP from the side. GP was on the opposite side of the bar from the first incident. This time Appellant touched GP just above the knee and directly on her skin.[7] GP said to Appellant "Really. Again." GP testified that Appellant then "acted like he was shocked and just grinned." During sentencing, GP provided a written unsworn statement and she read her statement to the court members.

The previously affirmed assault consummated by a battery conviction of RJ also arose from events at the hotel's lobby bar after the squadron party ended. The battery of RJ was close in time to the touchings of GP. According to eyewitnesses who testified at the first trial, Appellant touched RJ's buttocks as he lifted RJ's dress and exposed her undergarments to public view. RJ responded by saying no and slapping Appellant. This court's prior opinion explained the offense against RJ in greater detail and discussed RJ's prior and subsequent interactions with Appellant. *Rice*, unpub. op. at *18–20. At the rehearing, the parties entered into a stipulation of expected testimony for RJ which was read to the court members during sentencing. RJ also provided a written unsworn statement which she read to the court members.

---

[7] At the rehearing, Appellant was acquitted of an allegation of abusive sexual contact of GP, Specification 5 of the Charge, which alleged that he touched GP's "thigh with his hand" with the intent to gratify his sexual desire. We considered GP's testimony regarding the second touching—above her knee, and directly on her skin—as relevant evidence of Appellant's intent and GP's lack of consent for the earlier touching of GP's buttocks in Specification 4 of the Charge. *See United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017) (reviewing court may consider facts underlying an acquitted charge in deciding whether the facts support a separate charge because defendants are generally acquitted of offenses, not of specific facts).

## II. DISCUSSION

### A. Legal and Factual Sufficiency – Abusive Sexual Contact of GP

#### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citation omitted); *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

For the abusive sexual contact of GP, a violation of Article 120, UCMJ, based on the language charged in the specification, the Government had to prove beyond a reasonable doubt: (1) at the time and place alleged, Appellant committed sexual contact upon GP by touching her buttocks; (2) Appellant did so by causing bodily harm to GP, to wit: touching her buttocks with his hand without her consent; and (3) Appellant did so with intent to gratify his sexual desire. *See Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*),

pt. IV, ¶ 45.b.(7)(b).[8] In this context, the term "sexual contact" means "any touching . . . either directly or through the clothing, [of] the buttocks of any person, if done with an intent to arouse or gratify the sexual desire of any person." *See* 2016 *MCM*, pt. IV, ¶ 45.a.(g)(2)(A). "Bodily harm" means "any offensive touching of another, however slight, including any nonconsensual sexual act or nonconsensual sexual contact." *See* 2016 *MCM*, pt. IV, ¶ 45.a.(g)(3). "Consent" means a freely given agreement to the conduct at issue by a competent person. *See* 2016 *MCM*, pt. IV, ¶ 45.a.(g)(8)(A).

### 2. Analysis

Appellant argues the Government did not provide firmly convincing evidence that: (1) the touching of GP's buttocks occurred at all; and (2) Appellant touched GP with the intent to "satisfy" his sexual desires.

On the first point, Appellant cites a portion of GP's testimony that she was surrounded by three Airmen and then argues that only one of them testified and did not even remember GP being present. Appellant concludes his argument with "[o]ne would think this alleged unwanted touching would be significant enough, that it would not go unnoticed by surrounding witnesses." We disagree with Appellant's reading of GP's testimony and his conclusion that the surrounding Airmen should have noticed Appellant touch GP's buttocks.

GP was the only witness who testified Appellant touched her buttocks. GP testified he "firmly grabbed" her right buttock and applied "a lot" of pressure. Still, the touching was brief and lasted only one to two seconds. During direct examination, GP was not asked whether anyone was around her at the bar or if anyone had witnessed the touching of her buttocks. On cross-examination, GP agreed there were other people around her at the bar. However, she was not asked to identify them or explain whether she knew if they saw what Appellant did to her or her reaction to it. The only detail GP provided was that she was trying to interact with the civilian bartender at the specific moment in time that Appellant touched her buttocks.[9]

It was not until redirect examination that the assistant trial counsel asked GP to identify who else was around her at the bar. In response, GP testified:

---

[8] The 2012 *MCM* only included the statutory text of Article 120, UCMJ, which covered offenses committed on or after 28 June 2012. However, the elements and definitions for Article 120 offenses were not promulgated by executive order for more than four years and therefore first appeared in the 2016 *MCM* after Executive Order 13,740 was signed on 16 September 2016. *See* Exec. Order 13740, 81 Fed. Reg. 65175 (22 Sep. 2016).

[9] A female bartender testified at Appellant's first trial. No bartender testified during the rehearing.

> There were a lot of people trying [to] either pay an order, drinks, or tabs at the bar. I remember that I had spoken to Senior Airman [(SrA) LG] and he was actually just there as a [designated driver] to pick up people. I spoke to [SrA WF], [SrA GM]. So that's who I was kind of surrounded around at the time.

Later, the assistant trial counsel asked GP questions about who was around her during the times Appellant touched her:

> [Assistant trial counsel (ATC)]: So when you describe these two [touchings], was there anybody else around you?
>
> [GP]: Just kind of facing the front bar area, so they weren't paying attention, but yes, there were people around me.
>
> [ATC]: And do you know who those folks were?
>
> [GP]: I can't recall, sir.
>
> [ATC]: Okay. So you weren't aware of anybody else around you during those two [touchings]?
>
> [GP]: That I was able to notice? No. But there were people around me.

Considering GP's testimony, we reject Appellant's claim that the evidence is insufficient that the touching occurred at all. We limit our review on legal and factual sufficiency to the evidence produced at trial. Therefore, we cannot speculate about testimony from witnesses that were not called such as the bartender and two of three Airmen that GP recalled talking to while "at the bar." Regarding the one witness who did testify, SrA LG, he did not recall seeing GP at all and testified mostly about Appellant's intoxication. A rational factfinder could have concluded that if SrA LG did not see GP then his testimony could not raise reasonable doubt on the elements of this offense.

Turning to Appellant's second argument—that he was too intoxicated to form the requisite intent to gratify his sexual desires when he touched GP's buttocks—we also conclude that a rational factfinder could find the Government proved the requisite intent beyond a reasonable doubt. Appellant's intent was first shown by his choice of which body part he grabbed, GP's buttocks, and then the manner in which he did so, firmly. When confronted by GP, Appellant showed further evidence of his intent by asking GP if she liked it—a question with sexual overtones that a rational factfinder could find indicative of Appellant's own intent. A rational factfinder could also look at Appellant's second touching of GP, just 15 minutes later, to assess his earlier intent. This second touching, just above GP's knee and directly on her skin, again provided support of his sexual interest in GP. When GP confronted Appellant the second

time, he acted like he was shocked, then grinned, which showed that he understood what he had done. Appellant need not have shown sexual interest in GP in the past or earlier in the night for the Government to prove the essential elements of this offense beyond a reasonable doubt.

It is true that the evidence showed Appellant displaying many signs of intoxication after the squadron party. However, surveillance video of the hotel lobby which was admitted into evidence also showed Appellant walking around and recognizing and interacting with people he knew. This video, which did not capture Appellant touching GP either time, does not support Appellant's assertion that he was incapable of forming the requisite specific intent. It shows some amount of impairment but nothing that would cause a rational court member, or us, to conclude that he could not form specific intent to commit the offense. Despite Appellant's intoxication, we conclude that he had the necessary specific intent at the time of the offense and he acted on it by touching GP's buttocks without her consent so he could gratify his sexual desires.

Drawing "every reasonable inference from the evidence of record in favor of the prosecution," the evidence was legally sufficient to support Appellant's convictions of abusive sexual contact of GP beyond a reasonable doubt. *Barner*, 56 M.J. at 134 (citations omitted). Moreover, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses as the court members did, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325. Appellant's conviction for abusive sexual contact of GP is both legally and factually sufficient.

## B. Ineffective Assistance of Counsel

### 1. Additional Background

Appellant asserts two reasons why his civilian trial defense counsel, Mr. DC, and military trial defense counsel, Captain (Capt) JP, provided him ineffective assistance during the rehearing. First, Appellant argues that his trial defense team failed to investigate, call witnesses—including an expert witness, and raise a legitimate defense. In essence, Appellant argues that the defense at his rehearing should have been the same defense that was utilized at his first trial—that he had been involuntarily drugged during the holiday party and this involuntary intoxication made him not mentally responsible for the offenses or at least negated the evidence on specific intent. Appellant's second claim is that his trial defense team at the rehearing should have requested a continuance or a mistrial when GP testified that she was surrounded by other Airmen at the bar. We find no ineffective assistance of counsel.

Our court ordered Mr. DC and Capt JP to provide responsive declarations to Appellant's claims.[10] Appellant did not submit a declaration to support his claims, but he did testify at his first trial and that provides some information on why he believed that he had been drugged on the night of the party. The testimony of Dr. TM, the Defense's forensic psychiatrist from Appellant's first trial, and other defense witnesses are also relevant. We considered whether a post-trial evidentiary hearing is required to resolve any factual disputes raised by the trial defense counsel team's declarations. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997); *United States v. DuBay*, 37 C.M.R. 411, 413 (C.M.A. 1967). We find such a hearing unnecessary.

### a. Involuntary Intoxication Defense

At Appellant's first trial, Staff Sergeant (SSgt) CC was called as a witness for the Defense. SSgt CC was a military member assigned to the same squadron as Appellant and she attended the holiday party. SSgt CC brought her prescription Prozac to the party and showed the orange pill bottle to others and discussed her medication with them. Later in the evening, SSgt CC was drunk and paying her bar tab and she took her prescription bottle out of her "little wristlet" and left the pill bottle at the bar. SSgt CC retrieved the pill bottle the next day. It was kept with the other lost and found items the hotel had collected from the party. SSgt CC did not count the pills in the bottle to see if any were missing but as far as SSgt CC could tell none were missing.

Appellant testified that he and SSgt CC sat at the same table for dinner at the holiday party and he saw her pill bottle on the table. Appellant also saw a second pill bottle on the table near a senior noncommissioned officer from his squadron. No details were provided regarding this second pill bottle and the senior noncommissioned officer did not testify. Appellant remembered drinking alcohol before and during the party, but he had no memory after one part of the party—a white elephant gift exchange. Appellant claimed his next memory was waking up on the floor of his apartment with a pool of vomit next to him and the sun rising outside. Appellant testified that being drugged was "a possibility" and that he "tried to get tested" the next morning at an emergency room. On cross-examination, Appellant conceded he never saw someone put a pill in his drink. When asked whether he saw suspicious people at the hotel who might have drugged him, Appellant first answered he was "not sure" then that "he may or may not have" and finally, "Yes, possibly." Appellant could

---

[10] We considered the declarations to resolve this raised issue. *See United States v. Jessie*, 79 M.J. 437, 444 (C.A.A.F. 2020) (holding Courts of Criminal Appeals may consider affidavits when doing so is necessary for resolving issues raised by materials in the record); *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991).

not describe any suspicious person he saw that night or explain anyone who would have a motive to place a pill in his drink.

In the first trial, several witnesses testified about Appellant's behavior after he left the hotel, and most of them attributed it to him being drunk. For example, Appellant kept starting his vehicle in the hotel's parking lot while members of his squadron attempted to persuade him not to drive home. One squadron member, who was also drunk, sat in Appellant's passenger seat and would press the ignition on/off button to turn the engine off each time Appellant started the vehicle. Appellant would then realize his vehicle was off and press the button again restarting the engine. This pattern of shutting the vehicle on and off occurred several times without Appellant realizing how his vehicle kept being turned off. Eventually, Appellant got a ride home with two female military members.[11] There was testimony that Appellant needed help with his seatbelt, getting to his front door, and that he could not unlock his front door so it was done for him. After the two women returned to their car to leave, Appellant exited his apartment and was holding his phone. The two women were concerned that he would wander out into the street so they waited to make sure Appellant did not leave his front steps. When Appellant stayed where he was, they drove away. Finally, Appellant's sister testified about a strange conversation she had with Appellant sometime that night where Appellant claimed that he was in the woods, scared, and needed his sister's help. Appellant's sister stayed on the phone with him until Appellant's phone battery ran out.

Dr. TM also testified at Appellant's first trial and explained the effects of using Prozac and alcohol together. Dr. TM opined from her review of the evidence that it was a "possibility" that there could have been a drug involved in addition to alcohol to explain Appellant's behavior. Dr. TM agreed on cross-examination that Appellant's behavior was "100 percent consistent" with heavy alcohol use but maintained it was also consistent with someone who would have involuntarily ingested a drug with alcohol.

---

[11] In his original trial Appellant was convicted of abusive sexual contact for touching the breast and side of the female enlisted member who sat in the passenger seat during the drive to his house. Appellant was acquitted of this offense at the rehearing.

The military judge instructed the court members during the first trial on the defenses of voluntary intoxication and involuntary intoxication for the offenses from the night of the squadron holiday party.[12] Regarding involuntary intoxication, the military judge instructed the court members that they should only consider the defense if the Government proved all the elements of an offense beyond a reasonable doubt.[13] Then, and only then, would the members vote a second time to determine whether Appellant showed by clear and convincing evidence that he lacked mental responsibility because of involuntary intoxication. *See* R.C.M. 920(e)(5)(D) (*Manual for Courts-Martial, United States* (2012 ed.) (2012 *MCM*)). Given the findings of guilty at the original trial to four offenses that occurred at the hotel or shortly thereafter, the court members must have determined that Appellant did not carry his burden of clear and convincing evidence that he was involuntary intoxicated such that he was unable to appreciate the wrongfulness of his conduct.

On Appellant's first appeal before our court and his later appeal to the CAAF, Appellant was represented by Mr. DC who was also lead trial defense counsel at the rehearing. The first appeal, with Mr. DC as lead appellate counsel, was a resounding success for Appellant as it resulted in a set aside of some of the findings and the sentence. Mr. DC declared that by the time of the rehearing he was familiar with the first record of trial from his previous appellate work.

Mr. DC declared that after he was retained to represent Appellant at the rehearing he discussed the "failed involuntary intoxication defense" with Appellant. Mr. DC believed Appellant would have to testify at the rehearing to raise the defense again. After consultation with the defense's new expert forensic psychiatrist, Dr. KC, Appellant was advised not to testify and made the choice not to testify. Mr. DC declared there was "never any direct evidence" supporting that Appellant involuntarily ingested Prozac. Mr. DC also noted that Appellant was forced to concede many points during the "aggressive[ ]"

---

[12] At his first trial, Appellant was acquitted of one Article 120, UCMJ, sexual assault offense that allegedly occurred the day after the holiday party when he was not intoxicated.

[13] The military judge erred in permitting the members to consider evidence of a charged abusive sexual contact offense to be used as propensity evidence to prove another charged abusive sexual contact offense. *See Rice*, 77 M.J. at 365–66. However, this error only impacted whether the Government proved the elements of a particular abusive sexual contact offense beyond a reasonable doubt. The erroneous Mil. R. Evid. 413 instruction had no impact on the military judge's instruction regarding the Defense's burden to show involuntary intoxication and a lack of mental responsibility by clear and convincing evidence.

cross-examination and that those concessions could do more harm than good at the rehearing if Appellant testified.

According to the declarations of Mr. DC and Capt JP, Appellant elected not to testify at the rehearing after hearing the advice of his counsel. On the record, after the Defense rested its rehearing findings case, the military judge inquired on this point. Specifically, the military judge asked Appellant whether it was his "personal decision not to testify?" Appellant answered "Yes, Your Honor."

In our view, the Defense continued their strategy in sentencing and the focus on voluntary intoxication was beneficial to Appellant. For example, in the Defense's sentencing case, Dr. KC testified regarding Appellant's low risk of sexual recidivism, a matter that was not presented in the first trial. Dr. KC's testimony included his assessment of Appellant's intoxication as it impacted the risk of recidivism assessment. Dr. KC opined "[y]ou don't need a psychiatrist to tell you that he was drunk" on the night of the offenses. Dr. KC also provided a psychiatric diagnosis of Appellant on the night of the offenses as "alcohol intoxication" and noted this diagnosis was made after personally interviewing Appellant. Dr. KC's testimony was reinforced with Appellant's unsworn statement where he noted that he had "happily removed alcohol in its entirety" from his life.

On rehearing, the strategy employed by Mr. DC and Capt JP—a voluntary intoxication defense negating the element of specific intent—resulted in Appellant being acquitted of two of the three offenses. On sentencing, Appellant avoided the most serious punishment from his first trial—the bad-conduct discharge. While the results are not dispositive on the claims of ineffective assistance of counsel, they provide some perspective on whether the strategic decisions of trial defense counsel and the advice to Appellant that he should not testify were reasonable.

### b. Failure to Request Continuance or Mistrial

Appellant's second claim is that his counsel should have requested a continuance or a mistrial after GP testified on redirect examination that three Airmen surrounded her at the bar. Appellant argues that his trial defense team should have (1) asked SrA LG, who testified, whether he witnessed the touching of GP; (2) requested a continuance to interview the other two Airmen, SrA WF and SrA GM; and (3) requested a mistrial because GP refused a pretrial interview and Appellant "was surprised by her testimony regarding these three potential witnesses" and his counsel were also "probably surprised" to hear this testimony.

The declaration of Mr. DC notes that we have no declarations from any of the three Airmen before us. Mr. DC notes that SrA LG testified he did not see GP that night and this is "simply another way of saying" that SrA LG "did not

witness" the touching. Capt JP's declaration draws a similar conclusion regarding SrA LG. Capt JP also declares there was no evidence that the other two Airmen observed the actual touchings of GP.

The trial defense team's declarations do not specify whether either defense counsel interviewed SrA WF or SrA GM prior to trial. It is clear that SrA WF[14] wrote Appellant a character letter, dated more than a month before trial, and it was admitted into evidence during sentencing. While one line of the character statement was redacted before admission, the admitted statement shows no indication that SrA WF saw Appellant and GP together, observed either touching, or the subsequent responses of Appellant and GP. To the contrary, SrA WF opined that Appellant displayed a "high level [of] professionalism," and "set the example for younger [A]irmen like myself." SrA WF also made clear "I never once saw any actions on his part that could be perceived as detrimental to the unit."

Mr. DC addressed the absence of the witnesses around GP in both opening statement and closing argument on findings. In opening statement, Mr. DC asked the members to assess "[w]hether there's corroborating witnesses, with respect to [GP]." GP's testimony as a Government witness immediately followed. In closing argument, Mr. DC noted that the Government did not offer surveillance video of the incidents with GP. He then argued that photos of the bar area admitted as a defense exhibit showed the hotel had cameras installed that showed the bar area. Mr. DC then argued "there is a lack of corroborating witnesses. There are witnesses, supposedly, everywhere with [GP], that they're all around. And there's no corroborating witnesses."

**2. Law**

The Sixth Amendment[15] guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel, we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *Mazza*, 67 M.J. at 474).

We utilize the following three-part test to determine whether the presumption of competence has been overcome:

---

[14] At the time of his character statement, SrA WF had been promoted to SSgt.

[15] U.S. CONST. amend. VI.

14

1. Are appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions"?

2. If the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers"?

3. If defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result?

*Id*. (alterations in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)). The burden is on the appellant to demonstrate both deficient performance and prejudice. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation omitted).

"Defense counsel do not perform deficiently when they make a strategic decision to accept a risk or forego a potential benefit, where it is objectively reasonable to do so." *Id*. (citing *Gooch*, 69 M.J. at 362–63) (additional citation omitted). In reviewing the decisions and actions of trial defense counsel, this court does not second-guess strategic or tactical decisions. *See United States v. Morgan*, 37 M.J. 407, 410 (C.M.A. 1993) (citations omitted). It is only in those limited circumstances where a purported "strategic" or "deliberate" decision is unreasonable or based on inadequate investigation that it can provide the foundation for a finding of ineffective assistance. *See United States v. Davis*, 60 M.J. 469, 474 (C.A.A.F. 2005).

### 3. Analysis

#### a. Involuntary Intoxication Defense

We see no merit to Appellant's claims that his trial defense team failed to investigate, call witnesses—including an expert witness, and raise a legitimate defense at his rehearing. Appellant has not overcome the presumption of competence of his counsel.

Regarding the failure to investigate, Appellant claims his defense team "failed to seek" the same expert testimony of Dr. TM that was used at the first trial. While it is true that trial defense counsel requested the convening authority appoint a different forensic psychiatrist than Dr. TM, we see no failure to investigate. Mr. DC represented Appellant on his first appeal and reviewed the record of trial where Dr. TM's opinion on the possible interaction between Prozac and alcohol was laid out in two prominent locations. In the first trial, the Government sought to exclude Dr. TM's testimony as inadmissible under Mil. R. Evid. 702 and caselaw, and Dr. TM testified on this motion. The testimony was ultimately admitted and Dr. TM testified in the Defense's case in chief. Mr. DC's review of the record of trial provided a full opportunity to see

the limits of the expert testimony and what support it could provide for an involuntary intoxication defense. We find there is a reasonable explanation for defense counsel's tactical choice to request Dr. KC instead of Dr. TM and for their strategic decision to not use an involuntary intoxication defense which had already failed once.

In a similar manner, there is a reasonable explanation for the decision to not call witnesses at the rehearing who could have supported the involuntary intoxication defense. Those witnesses, such as SSgt CC and Appellant's sister, were not necessary for the chosen defense; the Defense had ample evidence to argue that Appellant's voluntary intoxication negated the specific intent required without calling witnesses of its own.

We also conclude that the chosen defense of voluntary intoxication was a legitimate defense. It was well supported by the testimony of the Government's witnesses and the admitted surveillance video. In our view, the defense of involuntary intoxication was weak and the evidence supporting it fell well short of the clear and convincing evidence burden Appellant faced for it to be successful. Even Dr. TM's testimony from the first trial conceded that the behaviors Appellant displayed were "100 percent consistent" with solely alcohol intoxication. While there was some evidence of involuntary intoxication, the defense team reasonably considered it and decided to only raise voluntary intoxication. This strategic decision was not based on a failure to investigate and was not unreasonable, and does not represent one of "those limited circumstances" that can provide a foundation for a finding of ineffective assistance. *See Davis*, 60 M.J. at 474.

Even if we assume *arguendo* that the defense team was ineffective for not utilizing an involuntary intoxication defense at the rehearing, there is no reasonable probability of a different result. *See Gooch*, 69 M.J. at 362. If the same evidence was presented as it was at the original trial, we see no reasonable probability that the factfinder at the rehearing would have determined that Appellant met his burden of clear and convincing evidence and acquitted him of the abusive sexual contact offense of GP. We also see no reasonable probability that that the rehearing court members would have adjudged a lower sentence even if they were presented with an involuntary intoxication defense where Appellant did not meet his required clear and convincing burden.

### b. Failure to Request Continuance or Mistrial

Appellant has failed to overcome the presumption of competence of his counsel for not requesting a continuance after GP testified about people surrounding her at the bar. The trial defense team anticipated there would be a lack of corroborating witnesses to support GP and mentioned it in their opening statement. The Defense returned to this exact point in closing argument—

that the Government failed to call any corroborating witnesses. This strategic decision to use opening statement and closing argument to highlight a weakness in GP's testimony, rather than seek a continuance, was reasonable.

Even if Appellant's counsel should have requested a continuance to interview SrA LG, who would testify later, and SrA WF and SrA GM, we do not find the level of advocacy fell measurably below the performance of fallible lawyers. A fair reading of GP's testimony was that she did not talk to any of these Airmen until after Appellant touched her buttocks and she walked away. GP's statement to law enforcement on 13 January 2015, contained in the record of trial as an allied paper from the first trial, supported this interpretation of GP's testimony. In that statement GP specifically mentions SrA LG and SrA WF so it should not have been a surprise that their names were mentioned during redirect examination as being around her at the bar. GP did not mention SrA GM in her written statement, but we find this to only be marginally significant because she never identified SrA GM as being a witness to either touching or their immediate aftermath. While those representing Appellant on this appeal interpret GP's testimony differently, we are not convinced the interpretation by the rehearing defense team of GP's testimony was faulty or their performance on this matter was measurably below what is ordinarily expected of fallible lawyers.

Next, we address the alleged failure to request a mistrial after GP testified that three Airmen were around her at the bar. We see absolutely no grounds for the military judge to have granted a mistrial, if one was requested. R.C.M. 915 gives the military judge discretion to grant a mistrial when such action is "manifestly necessary in the interests of justice because of circumstances arising during the proceedings which cast substantial doubt upon the fairness of the proceedings." GP's redirect testimony does not cast any substantial doubt upon the fairness of the proceedings, especially as two of the names were in GP's statement to law enforcement and one of them testified. Simply because GP mentioned a third Airman was around her at the bar, without more, gave little grounds for the Defense to seek a mistrial from the military judge.

On appeal, Appellant has not even attempted to provide us a declaration from any of the three Airmen. Therefore, we have nothing before us to show that if a mistrial was requested, that there was a reasonable probability that it would have been granted and that Appellant would have received a different result at his rehearing.

## C. Post-trial Delay

### 1. Additional Background

The parties agree that a facially unreasonable delay occurred when it took 127 days from the time the rehearing sentence was announced on 7 March 2019 to when the convening authority approved the sentence on 12 July 2019.

Appellant describes the delay as the Government's "failure to expeditiously assemble the record of trial and advise the convening authority." Appellant acknowledges that he did not request speedy post-trial processing prior to action but notes he did assert his right to speedy appellate review when he filed his assignments of error that are now before our court. Appellant supports his due process claim by focusing on the date of his original trial in January 2016 and the date of the offenses, December 2014. He argues that memories of the witnesses would further be affected if we ordered another rehearing. Appellant concedes that he was not confined but states he "remains under tremendous anxiety and stress that accompanies lengthy appellate review." If we find no due process violation, Appellant requests that we find relief appropriate and exercise our authority under Article 66, UCMJ.

The Government argues the length of the delay should be weighed against it but not heavily. The Government asserts that the Appellant was not prejudiced by the delay and did not experience particular harm but just the normal anxiety and stress that other appellants face with lengthy appellate review. Further, the Government argues that we should not exercise our authority under Article 66(c), UCMJ, to grant relief for an excessive post-trial delay. To this end, the Government argues the delay does not show bad faith or gross indifference in the post-trial processing of Appellant's case.

### 2. Law

We review whether an appellant has been denied the due process right to a speedy post-trial review de novo. *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006); *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004). *Moreno* established a presumption of unreasonable delay, triggering the *Barker v. Wingo*, 407 U.S. 514 (1972), four-factor analysis, when "the action of the convening authority is not taken within 120 days of the completion of trial." *Moreno*, 63 M.J. at 142.

In cases of facially unreasonable delay, we use the four-factor analysis set forth in *Barker*, 407 U.S. at 530: "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); *Toohey v. United States*, 60 M.J. 100, 102 (C.A.A.F. 2004) (per curiam)). When this four-factor analysis is triggered, the factors are

balanced, with "no single factor being required to find that post-trial delay constitutes a due process violation." *Id.* at 136 (citing *Barker*, 407 U.S. at 533). *Moreno* adopted a post-trial delay framework for analyzing prejudice using the following interests: "(1) prevention of oppressive incarceration pending appeal; (2) minimization of anxiety and concern of those convicted awaiting the outcome of their appeals; and (3) limitation of the possibility that a convicted person's grounds for appeal, his or her defenses, in case of reversal and retrial, might be impaired." *Id.* at 138–39 (citations omitted).

"[A] Court of Criminal Appeals has authority under Article 66(c)[, UCMJ,] to grant relief for excessive post-trial delay without a showing of 'actual prejudice' within the meaning of Article 59(a)[, UCMJ, 10 U.S.C. § 859(a),] if it deems relief appropriate under the circumstances." *United States v. Tardif*, 57 M.J. 219, 224 (C.A.A.F. 2002) (citations omitted). We consider the factors announced in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), to determine if *Tardif* relief is appropriate.

### 3. Analysis

Applying the first *Barker* factor, we find that delay from sentence to action was facially unreasonable because it exceeded the standard of 120 days by seven days. The length of the delay modestly weighs in favor of Appellant.

The second *Barker* factor, the reason for the delay, is well documented in the court reporter's chronology.[16] Initially, the court reporter sought transcription assistance. After more than a month of inaction, that request was abandoned and the Government decided the court reporter who heard the case would transcribe it. The court reporter's chronology shows her efforts to obtain transcription assistance, and that the request was reasonable to make given her workload. Nevertheless, we find the reasons for the delay weigh in Appellant's favor.

While this delay is regrettable, we do not see institutional neglect or bad faith. The transcription itself occurred from 18 April 2019 to 11 June 2019, which was not an unreasonable amount of time though it was slowed by the

---

[16] The Government's answer and Appellant's reply brief both reference this chronology which was in volume 1 of the record of trial at the time Appellant's case was docketed with our court. The parties have not offered an explanation as to whether this chronology is part of the "record" as defined in R.C.M. 1103(b)(2), a matter "attached to the record" as defined in R.C.M. 1103(b)(3), a matter that we may consider because both parties have referenced it in their briefs, without objection, or something we may not consider on appeal under *United States v. Jessie*, 79 M.J. 437, 440–41 (C.A.A.F. 2020). We assume without deciding that we may consider the chronology as neither party objected to it, at any point. *See United States v. Stanton*, ___M.J. ___, No. 19-0449, 2021 CAAF LEXIS 28, at *5, n.2 (C.A.A.F. 13 Jan. 2021).

demands of other cases. The remainder of post-trial processing was done in a timely manner. The staff judge advocate's recommendation was signed on 21 June 2019 and a clemency request was submitted by Appellant on 3 July 2019. On 12 July 2019, an addendum was signed by a new staff judge advocate and on the same day the convening authority approved the sentence.

Applying the third *Barker* factor—Appellant's assertion of the right to timely review and appeal—during post-trial processing Capt JP and Appellant did not mention the delay or demand speedy post-trial processing. The clemency submission was a robust 109 pages long, raised two legal errors, and requested any form of sentence relief the convening authority would grant. Appellant or Capt JP could have highlighted the transcription delay and the reasons for it as they had the court reporter's chronology from the record of trial. While Appellant made a claim for speedy appellate review before our court, we are issuing our decision within 18 months of docketing. We weigh the third factor in favor of the Government, but only slightly as the "primary responsibility for speedy processing rests with the Government." *Moreno*, 63 M.J. at 138.

Under the fourth *Barker* factor, we find no prejudice to Appellant from the seven-day delay in the convening authority's action. Appellant was not confined so he suffered no oppressive incarceration. This appeal does not result in another rehearing on the findings or sentence, so we find no impairment of Appellant's ability to present a defense at a second rehearing. *See id.* at 140. This leaves Appellant's assertion of tremendous anxiety and stress that accompanied the lengthy appellate review and his references to the dates of the offenses and his first trial. We do not see how the dates of the offenses matter to our analysis of timely post-trial processing and appeal. We find Appellant's statements about anxiety and stress to be general and lacking in describing a particular harm he suffered from the week of post-trial delay. Given these circumstances, we find no prejudice for the delay in the action by the convening authority. *See id.* at 138–39 (citations omitted).

Further, absent a finding of prejudice as a result of delay, the delay does not constitute a due process violation unless it "adversely affect[ed] the public's perception of the fairness and integrity of the military justice system." *See Toohey*, 63 M.J. at 362. We do not find the post-trial delay is to the degree that it adversely affected public perception of fairness and integrity as articulated by *Toohey*. We note that Appellant's case was docketed with our court on 29 July 2019, 17 days after action, and more than a week below that 30-day standard which shows diligence by the Government in a different step of post-trial processing. This would not go unnoticed by the public in their perception of the fairness and integrity of the military justice system in Appellant's case.

We have the "authority under Article 66(c) to grant relief for excessive post-trial delay without a showing of 'actual prejudice' within the meaning of Article 59(a)." *Tardif*, 57 M.J. at 224 (citation omitted). Considering all the facts and circumstances, and applying the factors articulated in *Gay*, we decline to exercise our Article 66(c), UCMJ, authority for excessive post-trial delay absent a due process violation in this case. *See id.* at 223–24; *Gay*, 74 M.J. at 744. We find Appellant is not entitled to relief for the seven-day delay in the convening authority's action.

## III. CONCLUSION

This court and the CAAF previously affirmed the findings of guilty to assault consummated by a battery in Specification 2 of the Charge. Upon rehearing, the approved findings to Specification 4 of the Charge and the sentence are correct in law and fact, and no other error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings to Specification 4 of the Charge and the rehearing sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court